May it please the Court, what are the chances that the panel would have two cases in a row that deal with infinitesimal gaps and touchable? I would suggest that Vegas couldn't even put the book on that one. Well, to begin with, the fatal flaw of the District Court's claim construction of the terms at issue in this case is failing to determine how those terms would be understood by that person having ordinary skill in the relevant art after reading the claim in the context of the entire patent, including the specification file history. Rather, what we have here is the District Court focusing on mechanical aspects of the inventions. These inventions are electromechanical devices, ignoring the electrical and electromagnetic aspects of the devices, those aspects that were key to the inventions and certainly the focus of that person of ordinary skill. Wouldn't the person of ordinary skill be more concerned with electrical contact than physical contact? It alters the signal. This is what we call impedance. Impedance is measured as a matter of reflectant coefficient, as that term is used in the patent. Very important to understand who that person of skill in the art is going to be, and both parties agree. You answered the Chief's question by stressing, yes, this is all about electrical contact, but you didn't choose that language in the claim. What is the term the Court had to construe? The term was corresponding to physical contact, Your Honor. Correct. Isn't there a distinction between physical contact on the one hand and electrical contact on the other? Because current can jump despite not touching, of course, but you didn't claim that. Well, I would suggest, Your Honor, that physical contact is broader than just mechanical touching. That physical contact can include the concept of electrical contact. They're not mutually exclusive conditions. The appellee in their brief bring up a great example, and that is of lightning. The term corona discharge is what's used in this patent, and frankly, it's lightning. It's like when you have a spark plug, you have ionized air and there's a voltage differential. The voltage differential jumps the gap, the air gap, and whammo, you have lightning. If anyone in this courtroom were struck by lightning, I would suggest to Your Honor that they would certainly believe that they had been in contact with something and that that something was physical, assuming that they were… Well, the result to them was physical, right? Well, I think that they would believe that the communication of the electricity that's flowing through that arc gap is physical. Physical vertical distance between each probe and the center conductor. Why doesn't the entire context of that language emphasize what Judge Moore is talking to you about? There's modifying language, Your Honor, and that is corresponding to. Corresponding to, as this court has recognized, does not necessarily mean equal to or equivalent. As Mari's own expert advises, it's a relationship term, and here what it does is it relates linear distance to the functioning of the component. What we have is the patentee electing to claim structure by using functional language. And again, I would stress that the importance is to focus on who this person of ordinary skill is. This is no slouch. Both parties agree the skill set is high. We have someone who has at least a bachelor's of science in electrical engineering, if not a master's, with a focus on microwave tuning, and at least six years of work directed to the art of microwave tuning in a laboratory environment. This is not the uninitiated. This is someone who brings to bear a significant amount of experience and wherewithal regarding the concept of electromagnetic tuning. Can I ask a practical question? If the probe touches the central transmission line and a short occurs, does that destroy the device, or do you just need to reset it to continue with maintenance? A great question. Not well easily answered. It certainly disrupts the device. It's possible the device can be repaired in certain instances. Is that just a matter of pushing a reset button? No, it's not, Your Honor. Part of the testimony that the court received in relation to the summary judgment motion was from Mari's technician, a gentleman named Hernandez. And Mr. Hernandez testified that part and parcel of his job, at least 50 tuners had been received over time that had some type of damage that was attributed to this arcing concept. So it's not something that is easily reset by the user. In fact, in these situations, the user had to send the devices back to the manufacturer to be adjusted or repaired. I guess I'm still struggling to understand your distinction, because as the Chief Judge read you a portion of the claim, but if you continue to read on, it talks about physical vertical distance between the probe and the center conductor, and then it goes on talking about being remotely adjusted to a minimum of zero, that minimum distance corresponding to physical contact. It says the distance has to be a minimum of zero. But you're saying it doesn't have to be a minimum of zero. It has to be a minimum of whatever would allow electric current to continue flowing through. And, you know, while if all of the surrounding language weren't present, maybe you'd have a stronger case. You probably agree with that as well. But the fact that it talks about the minimum distance being zero in conjunction with the word physical contact, why doesn't that, and talking about distance in repeated places, why doesn't that really just hammer home that you're really measuring the physical distance between the objects? They have to be in contact. Excellent point, Your Honor. I think in reading through the claim limitation, Your Honor missed two extremely important words, and that is corresponding to. Corresponding to, again, a relational term. What the patentee is elected to do here is to take structure and to define structure in functional terms. The function of this tuner, the electromagnetic tuner, is to create impedances and allow the user to change frequencies and to optimize what's called the device under test. You're focusing today on corresponding to. You're sort of hanging your whole hat on it. I confess, we have a lot of patent cases today. Did you argue that in the blue brief? I mean, did you argue that corresponding to is the critical distinction, which is why it's electrical touching and not physical touching? Yes, Your Honor. I can't quote you chapter and verse of the brief as we stand here. I don't remember anything about corresponding to being a focus of your briefing. And as I said, we have three big patent cases today. Maybe I missed it, but I'd love it if you pointed out to me, maybe in rebuttal after you have time to take a look at it, where that argument is in the brief. I will take a look for it, Your Honor. Again, our suggestion is that the court ignored the concept of electrical contact, and we've been through this. That's because you used the term physical contact. Is there anything in the specification that would cause us to find fault with the district court's claim construction? I think yes, Your Honor. First things first, nowhere in the specification is the term touch or mechanical touching utilized. Specifically, I'd point you to figure 11D, and that's at A204 in the appendix. All of the figures together, the 11A through D, what they show us is that the greater the distance between the probes and the center conductor, the more power can be transmitted without shutting the tuner down. Now, in pointing out the invention, a patentee provided that, and this is a quote from Column 5. Does this help you at all, though? You show various distances between the probe and the transmission lines in Figure 11. That doesn't vitiate the notion of physical contact, does it? Well, I would ask the question, Your Honor, where is the term physical contact used in the patent? Or where is touching shown? Nowhere. If you review in A204 the drawings 11A through C, at no time do you see that there's actual contact between the probes and the center conductor. And again, the relationship is borne out in 11D. The appellee's expert, Dr. Eisenhardt, admits that 11D does not show mechanical touching. So, you know, the rhetorical question, Your Honor, is where in the specification do we learn mechanical touching? It's simply not there. I'd also point the Court's attention to the extrinsic evidence that shows that there's error in these constructions limiting instruction. I'm not sure that it's fair to say that the district court required mechanical touching. He simply pointed out that there's a range which at one end had zero. Well, Your Honor, in granting the appellee some discretion… Same thing shown by 11C and the rest of the patent. Well, the proof is in the pudding, isn't it, in regard to construction and the applications of construction. The district court granted the appellee summary judgment on the issue by finding that their device didn't or could not make that physical contact. The court hung her hat on the concept of physical contact. Regardless of whether she stated it in the construction… I'm sorry, Your Honor. …or not they put in their device prevented it from getting to a distance of zero. That it could not touch. Could not achieve zero distance. Well, I believe what she said in her summary judgment order, she actually used the term touch. Since it could not touch, it could not infringe. If you are not successful on the claim construction issue, is there anything else for us to have to consider in this case? Yes, Your Honor. Even if the court were to accept the lower court's decision on claim construction, the court nonetheless found facts. And particularly, I'll point you to three things. Number one, there is no dispute that there were scratches on the centerline conductor of the Q device when it was inspected. Dr. Eisenhardt, Mario's expert, testified that those scratches could have been made by the probes. More specifically, to this particular question. So, are you testifying to a reasonable degree of certainty that the contact with the probes absolutely could not have been… made those scratch marks that we agree are on the center conductor? Answer, well, there are some scratches on it that seems to be axial and that could have been made with the probes. I'll grant that. I would suggest, Your Honor, that that testimony alone precludes the entry of summary judgment. Certainly, in combination with testimony from Mario's… But isn't the device designed to have a gap at all times, a two-inch gap, I guess it was? The probes are two inches apart? That… There's like a nut or something in between them, right? That relates to the horizontal separation of the probes, Your Honor. So, what we have here is we have… 53 to 91 microns, is that the one? The vertical distance is measured in microns. I have limited time I'd like to reserve for rebuttal. Thank you, Mr. Ennis. Thank you.  May it please the Court. The plain and ordinary meaning of the claim language controls unless that meaning renders the claim unclear or is overcome by a special definition that appears… We've heard Mr. Ennis tell us that we should view that physical contact language as relative because of the use of the term corresponding. Could you address that? Yes, I would be happy to. The claim doesn't define the alleged invention in functional terms. It defines the invention in structural terms, and it says that the physical vertical distance between the probe and center conductor must be adjustable to zero. The word corresponding is a word of relationship. It means that the probe must have the relationship to the center conductor of zero physical contact. The only way that the probe could have that relationship with the center conductor of physical contact is if it's actually touching the center conductor. Otherwise, it's not corresponding to physical contact. The panel also asked about whether the corresponding argument had been raised in the blue brief. I am pretty certain that the corresponding argument was not raised in the blue brief. And so there's a question about whether it's been raised by the appellant on this appeal. Was it raised in the blue? Yes, it was. So the claim uses the phrase physical contact, not corona discharge, and certainly not electrical contact. Well, one of your opponent's arguments is that there's nothing in the specification that would have actually provided support for physical touching. And we generally tend to construe claim terms in a manner in which to preserve their validity if there's reasonable constructions as such. Is there no written description support for zero distance for actual physical contact? Yes, I agree that there isn't written description support. That may be a reason to invalidate the claims for lack of written description. Or would we just construe the claim to mean electrical contact rather than physical contact? I don't think we can do that because that would be rewriting the claim. The patentee used the phrase physical contact. And the only way that I'm aware of that you can rewrite that as electrical contact is if the specification, if the patentee acts as his own lexicographer and redefines physical contact in the specification as electrical contact. We look at figure 11 and you see several probes there. Never are they brought into actual contact with the transmission line. Can you address whether that gives us an understanding of what was meant by physical contact? I don't think it does. These figures are not inconsistent with physical contact. They just show various distances between the probe and the center conductor. And if anything, figure 11D, actually all these figures in figure 11, indicate that the appellant's construction cannot be correct. The appellant's construction is that the minimum of zero is wherever the corona discharge happens. The level at which the corona discharge happens between the probe and the center conductor depends upon the power that the customer is putting into the center conductor. Less power means that the minimum distance is smaller. More power means that the minimum distance is higher. It's like lightning. Lightning has a lot of power, so it's going from the clouds down. Wouldn't one of skill in the art understand all of that? Yes, a person of ordinary skill in the art would understand that, and they would also understand what physical contact means, actual metal-on-metal touching. If the minimum distance varies depending upon the customer's use of the tuner, then the claim is indefinite because it imports a method limitation of the claim. The same tuner box can be infringing or non-defringing depending on what the customer does with it. And that can't be an appropriate interpretation of the claim. The best interpretation of the claim is one that uses the plain and ordinary meaning of the phrase physical contact. And as the inventor of the patent, Dr. Christos Saronis, testified, there's a benefit to allowing the probes to be adjustable all the way down to physical contact with the center conductor. And that's because the advantages is that it allows you to maximize the range of the tuner. If you have anything artificial stopping the downward movement of the probe, then you've given up some of the tuning range of the tuner. And that's what happens in my client's tuner. I thought Judge Clevenger revealed that if there is actually a physical contact, and if the transmission line contacts the probe, you have damage. The machine becomes inoperable, right? No, you get damage if the probe goes below zero and pushes against the center conductor such that it displaces the center conductor or bends it. And that's the testimony that my colleague was referring to. In the case of Corona, that's just by touching, correct? You can get a short by touching or a Corona effect if it's close enough and the power's high enough that you get an arcing over the air gap between the probe and the center conductor. But that arcing or shorting doesn't damage the tuner. You'll get a flat line on the measurement equipment. But the damage happens when you basically ram the probe through the center conductor and displace it. And that's the repair that Mr. Hernandez, our technician, was talking about when he was deposed. Incidentally, those tuners that were repaired were not the accused two-carriage tuners. Those were single-carriage tuners. And there isn't any evidence into the record as to why exactly those tuners had to come back for repair. For all we know, the customer mishandled them and broke the tuners and they had to come back. Mr. Franklin, you argued that an alternative basis for affirmance would be for us to find indefinite claims of the 293 patent. Now, I just looked at your briefing. It was filed in February of 2013. Well, in March of 2013, we issued an opinion called Radio Systems Corp. v. Laylor. Yes. Are you familiar with it? I am. And so do you continue to maintain that this is proper to ask for invalidity as an alternative ground for affirming a holding of non-infringement? Or do you accept that the law is such that that would have to be a cross-appeal? I do maintain that argument. The Radio Systems case came down after we filed the brief. We filed a two-page supplemental brief that addressed the Radio Systems case. The Radio Systems case dealt with invalidity based upon prior art. Our case deals with invalidity based upon indefiniteness. Indefiniteness is necessarily raised as part of the infringement analysis. Well, it would be if you were talking about the indefiniteness of the claim term that was under consideration on appeal. But as I understand it, you actually want us to find a totally unrelated claim term, i.e., unrelated to physical contact, which is the issue on appeal, indefinite. Yes. Yes, there's two. I don't know if you appreciate the distinction that I'm drawing. Certainly, you can say the claim term on appeal is indefinite. But for you to say a totally different claim term is indefinite and that somehow wouldn't amount to an enlargement of the judgment seems strange to me. I think I understand your point. First, they have raised two claim terms on appeal, the vertical minimum of zero and the horizontal minimum of zero. The claim term that you're talking about is the means of electrical remote control. Yes, the controller is what you say is indefinite because there's no algorithm, right? That's correct. So that's a totally different claim term as I understand it from what's on appeal. That's a different claim term than they have raised on appeal. Right. So if you want to raise it on appeal, it would have to be a cross appeal. That's exactly the point. If we entertain your challenge and you win, we're going to enlarge the judgment, right? The effect would be to enlarge the judgment. Yes, the answer is yes, right? We enlarge the judgment. Yes. And the rules are that if you want to enlarge the judgment on an issue, you file a cross appeal. The reason for that is to give your adversary another bite at the apple. Just because the effect of it is to enlarge the judgment doesn't mean that I can't raise it if it's otherwise appropriate. They have to show that our tuner meets every element of the claim in order to prove infringement. I don't understand your response. You can't raise it if it's otherwise appropriate. What do you mean? I don't understand. Well, they need to show that our tuner meets all elements of the claim. One element is the means of electrical remote control. They have to show that our tuner has that. They can't because that term is not susceptible to construction. And so that would be an independent basis to support the judge's finding of non-infringement. We don't infringe this claim because our tuner doesn't have the remote control because that term isn't susceptible to construction. Well, that would be no different than saying we don't have this. You can't sue us for infringement because a defense to infringement is in validity and your claim is otherwise invalid because it captures exactly what's in the prior art, and we're entitled to practice the prior art. So, unfortunately, it seems to me that the logic that you're using would apply identically to any aspect of invalidity, and we've ruled that out as an across-appeal. The difference is that claim construction is necessarily raised as part of the infringement analysis. The invalidity based upon prior art is not, and that's the distinction I'm trying to make. The way the judge left, the district judge left... But you want a judgment from us that the patent is invalid. Excuse me? You want a judgment from us that the patent is invalid. Obviously, that would be nice, but we're obviously just asking for... No, but all you want is us to say, well, there are two reasons why the judgment of non-infringement stands. So you get to say, well, I won for two reasons instead of one. It doesn't seem to me... I mean, it seems to me what you really want to do is you want to get the patent invalidated because you want to get it all gone away. You don't have to worry about it in the future. Obviously, my client would like that. And that's expanding the judgment, like, vastly. But the fact that it expands the judgment shouldn't prevent my client from making what we feel would be an otherwise appropriate non-infringement argument that is necessarily raised as part of the infringement analysis. The district judge left us in a difficult situation. She exercised her discretion and declined to rule on the invalidity claims based upon... How hard is it to file a cross-appeal? I mean, you must have known you were walking right into this whipsaw. I couldn't file a cross-appeal because the final judgment was completely in my client's favor. There was nothing to cross-appeal. I can't... So the final judgment wasn't in your client's favor. They didn't issue a... Didn't you file a cross-claim for declaration of invalidity of this patent? Yes, but... And the district court didn't grant you relief on that claim? The district court didn't rule on that claim. To get to a final judgment to get before the federal circuit, the claim was dismissed without prejudice. That's not a ruling for or against us, and it's not something I can file a cross-appeal on. So I would have filed a cross-appeal, but I can't cross-appeal an issue that I don't have an adverse ruling on. And so while we would argue that we've preserved the right to argue invalidity based upon prior art in any subsequent case because that was dismissed without prejudice, it seems to me that it would be appropriate in the context of this appeal... Did you have to accept the dismissal? Excuse me? Did you have to accept the dismissal? You must have conceded to the dismissal, correct? We agreed to the dismissal... Well, once you agreed to the dismissal of your claim, then you created the situation under which you can't cross-appeal. Yes, but there wasn't any other way to get this case to a final judgment. You're right, because you should have pressed the district court now. You found for us on infringement. Now at district court, you're required by law to address our validity challenges. And instead, you decided to forego those to get final judgment to come up to us on appeal. So you can't now cry to us that you want a decision on those things that you voluntarily dismissed below. My understanding is that the district court, once she finds non-infringement, has the discretion not to raise the invalidity issue. Was the validity issue a counterclaim or a defense? It was both. Yes, so she doesn't... It was a counterclaim. Morton against Cardinal suggests somebody ought to address it, right? Your counterclaim is still alive, even if you win a verdict of no infringement. Yes, but if she... She cited case law in order saying that she has the discretion not to raise it. Well, should have appealed that. Okay. Anything else I can address for you on a different issue? Thank you, Mr. Franklin. Thank you very much. Mr. Ramos. Thank you, Your Honor. Why don't we start with the place where we left off? I think you're right, Your Honor. Once the dismissal occurred, it was voluntarily dismissed. It should be the end of the road. There is, of course, the opportunity to file a conditional cross-appeal, something that the appellee elected not to do. That issue should be over. One of the things that my colleague discussed in his response was the testimony of Francisco Hernandez, the MARI technician. In particular, what is the creation of the accused device? Well, the testimony and the evidence before the court was the accused device actually was one of MARI's existing single carriage tuners. It was the 982 tuner. And what they did was they took another carriage and they added that carriage to the first carriage. So now we have two carriages coursing along the same centerline conductor. The only difference other than adding the carriage to the accused tuner was that they put an optical limit switch in limiting horizontal movement. So all other matters of the device, including the optical limiting switches to move the probes up and down in a vertical basis, were identical to the same tuners that Mr. Hernandez had been working on and that makes up part of the record. Your Honors, I'm out of time. All right. Thank you, Mr. Hernandez. Our final case today will be Comifer Corporation v. Antec.